**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 30, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

───────────────────────────────

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

CAMERON LYNN,

    Defendant - Appellant.

No. 25-5027

───────────────────────────────

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:24-CR-00076-GKF-1)**

───────────────────────────────

Michael L. Burke, Assistant Federal Public Defender (Jon M. Sands, Federal Public Defender, with him on the briefs), Phoenix, Arizona, for Defendant - Appellant.

Steven J. Briden, Assistant United States Attorney, Northern District of Oklahoma (Clinton J. Johnson, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff - Appellee.

───────────────────────────────

Before **BACHARACH**, **EBEL**, and **KELLY**, Circuit Judges.

───────────────────────────────

**KELLY**, Circuit Judge.

───────────────────────────────

Defendant-Appellant Cameron Lynn was convicted by a jury of various offenses in Indian country including first-degree murder in violation of 18 U.S.C. §§ 1151, 1153, and 1111 (Count One); assault with a dangerous weapon with intent

to do bodily harm in violation of 18 U.S.C. §§ 1151, 1153, and 113(a)(3) (Count Two); carrying, using, brandishing, and discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count Three); and assault resulting in serious bodily injury in violation of 18 U.S.C. §§ 1151, 1153, and 113(a)(6) (Count Four).  He was sentenced to life imprisonment on the murder count and 120 months each on the other counts, with Counts One, Two and Four to run concurrently, and Count Three to run consecutively to the other counts, resulting in a sentence of life plus ten years' imprisonment.

On appeal, he argues that the district court erred in (1) admitting a screenshot from a tribal database showing Mr. Lynn's tribal membership and blood quantum; (2) adding certain language to the self-defense instruction; and (3) denying his request to instruct the jury that the government must disprove imperfect self-defense beyond a reasonable doubt.  Exercising jurisdiction under 28 U.S.C. § 1291, we reject the first two claims of error but agree with the third, so we remand with instructions to vacate Mr. Lynn's murder conviction and conduct further proceedings.

**Background**

On the evening of February 23, 2024, Mr. Lynn was staying at a homeless camp in Tulsa, Oklahoma with his brother, Jason Lynn, his then-romantic partner, Cara Campbell, and James "Cowboy" Ervin, Jr.; the group was using narcotics.  I R. 538, 541–42, 545–46, 577–80.  At some point that night, Mr. Lynn went to a nearby encampment where Teresa Burke, Alcides "Junior" Monroig, and Jesse Walthers

2

were sleeping in tents.  Id. at 546–47, 584–85, 710–14, 717–20.  About a month before, Jason had gotten into a verbal confrontation with Ms. Burke after he had come by her camp asking for drugs; Ms. Burke yelled at him and threatened to "beat" and "jump" him.  Id. at 604–08, 721–22.

Mr. Walthers asked who was outside; Mr. Lynn claimed to be Jason.  Id. at 720–21.  Mr. Lynn told the group he wanted his belongings back, claiming they had been stolen; Mr. Walthers told him they did not have his belongings and asked Mr. Lynn to leave.  Id. at 723.  Mr. Lynn continued asking where his belongings were and mentioned he had a gun.  Id. at 723–24.  In response to that statement, Ms. Burke told Mr. Walthers to shine a flashlight on Mr. Lynn, which he did.  Id. at 724–25.  Mr. Lynn then told Mr. Walthers he would leave if he turned the flashlight off.  Id. at 726.

Once Mr. Walthers turned off the flashlight, Mr. Lynn fired multiple shots at the tents; one shot hit Mr. Monroig in the chest, killing him, while the other hit Ms. Burke in the torso, injuring her.  Id. at 726–33, 774–80.  Ms. Burke later identified the shooter as Mr. Lynn.  Id. at 734–38.  Mr. Lynn ran back to his encampment and told Mr. Ervin and his brother Jason that the individuals at the other encampment had been aggressive and that a "white guy" or "white dude" had shot at him first.  Id. at 550–51, 593, 612.  According to Ms. Burke, none of her group had a gun or anything that looked like a gun, or told or indicated to Mr. Lynn that any of them had a gun.  Id. at 726, 738–39.

3

Police soon arrived on the scene and identified five shell casings outside the tents and more than five bullet holes in them.  Id. at 490, 532–35, 946–47, 952.  They did not find any firearms inside the tents or the immediate surrounding area.  Id. at 866–67.  However, they later recovered a black Glock 19 from another individual to whom Ms. Campbell had sold the gun in exchange for narcotics.  Id. at 630, 678–80, 693.  Ballistics testing matched the gun to the shell casings found at the scene.  Id. at 873–75.  According to Jason, Mr. Lynn owned a black Glock 19 pistol.  Id. at 580–81.

Mr. Lynn's trial lasted three days; the government called fourteen witnesses, including his brother Jason, Mr. Ervin, Ms. Burke, and law enforcement officers, while the defense only called two witnesses — the case agent and an expert witness who testified to the effects of using narcotics.  Id. at 435–36, 664–65, 900–01.  Mr. Walthers did not testify because the government was unable to locate him.  Id. at 925–27.

Before closing arguments, the court instructed the jury on self-defense, imperfect self-defense, first-degree murder, and on three lesser-included homicide offenses: second-degree murder, voluntary manslaughter, and involuntary manslaughter.  Id. at 1071–72, 1139–50.

At closing, defense counsel did not contest that Mr. Lynn was the shooter.  Id. at 1086.  Instead, counsel presented two theories: first, that Mr. Lynn acted in self-defense because Mr. Walthers had a gun and shot first, and second, based on testimony from witnesses that it was not uncommon to hear random gunshots in the

area, that Mr. Lynn heard such shots and mistakenly believed that he was in danger, thereby acting in imperfect self-defense.  Id. at 1086–91.

## Discussion

Mr. Lynn first argues that the district court erred when it admitted Exhibit 59, a screenshot from a tribal database showing Mr. Lynn's tribal affiliation and blood quantum, thereby failing to prove Indian status and requiring reversal on all counts. Aplt. Br. at 10–11.  Next, he contends that the court erred by improperly instructing the jury on perfect self-defense, also requiring reversal on all counts.[1]  Id. at 11. Finally, he asserts that the court erred by failing to instruct the jury that the government must disprove imperfect self-defense beyond a reasonable doubt, justifying reversal on Count One, his conviction for first-degree murder.  Id. at 12. We address each of these claims in turn.

### A.  Admissibility of Exhibit 59.

Mr. Lynn's first claim pertains to the admission of Exhibit 59, a screenshot from the Choctaw Nation of Oklahoma's tribal enrollment database showing Mr. Lynn's tribal affiliation and blood quantum.  Id. at 12–20.  He contends that the screenshot was improper hearsay and its admission violated the Confrontation

---

[1] Indian status is an essential element of Counts One, Two and Four, and perfect self-defense is a complete defense to the same.  Aplt. Br. at 10; I R. 1142–49, 1152, 1157.  Because Count Three tied Mr. Lynn's use of a firearm to Count Two, Mr. Lynn argues that reversal on Counts One, Two, and Four necessarily requires reversal on Count Three.  Aplt. Br. at 10 & n.5.

Clause, and that the error was not harmless because the government was otherwise unable to prove Mr. Lynn's Indian status, an essential element of Counts One, Two, and Four, beyond a reasonable doubt. Id. Before assessing Mr. Lynn's arguments, we briefly discuss the substantive requirements to prove Indian status under federal law and their relevance to this appeal.

Under 18 U.S.C. §§ 1151, 1152, and 1153, "Indian status is an essential element" and a "jurisdictional predicate" to Counts One, Two, and Four. United States v. Harper, 118 F.4th 1288, 1296 (10th Cir. 2024). We have adopted a two-part test for determining Indian status: "the government must prove that the defendant (1) has some Indian blood; and (2) is recognized as an Indian by a tribe or by the federal government" at the time of the offense. United States v. Hatley, 153 F.4th 1112, 1121, 1123 (10th Cir. 2025) (citation modified). One way of proving a defendant's Indian status "is to adduce a tribal document containing such information." United States v. Wood, 109 F.4th 1253, 1257 (10th Cir. 2024). Because such documents ordinarily contain hearsay, or out-of-court statements offered to prove the truth of the matter asserted therein — the defendant's Indian status — the government must show that they fall under an applicable exception to the bar on hearsay. Hatley, 153 F.4th at 1124.

At trial, the government sought to prove Mr. Lynn's Indian status through (1) Exhibit 59 and (2) the testimony of Mr. Lynn's brother, Jason. Exhibit 59 includes a photo of Mr. Lynn and identifies him as a member of the Choctaw Nation of Oklahoma, that he was enrolled in the tribe on September 20, 2001, that his blood

6

quantum was 63/126, and that he was issued a Certificate of Degree of Indian Blood (CDIB) on February 14, 1991. Aplt. Br. at A-1. A CDIB identifies an individual's blood quantum and is issued by the Bureau of Indian Affairs. I R. 811–12; Hatley, 153 F.4th at 1123. The record does not indicate when the information was entered or who entered it. Aplt. Br. at A-1. The government introduced Exhibit 59 through the testimony of Erica Tomlinson, a program coordinator and supervisor at the tribal enrollment department of the Choctaw Nation of Oklahoma. I R. 793–94, 798. Over defense counsel's objections, the court admitted Exhibit 59 under Federal Rule of Evidence 803(6). Id. at 798, 847–48.

With that information in mind, we turn first to Mr. Lynn's hearsay claim before addressing his Confrontation Clause claim.

### 1. Business Records Exception.

Mr. Lynn first claims that the court improperly admitted Exhibit 59 under Rule 803(6). The district court's evidentiary rulings are reviewed for an abuse of discretion, while its interpretation of the Federal Rules of Evidence is reviewed de novo. Harper, 118 F.4th at 1295. An abuse of discretion occurs when the court bases its decision on a clearly erroneous finding of fact or conclusion of law, or if the decision manifests a clear error of judgment. Hatley, 153 F.4th at 1120. We afford district courts broad discretion to determine the admissibility of evidence. United States v. Merritt, 961 F.3d 1105, 1111 (10th Cir. 2020). Our review of a court's rulings on hearsay is "especially deferential" because they are "particularly fact and case specific." Harper, 118 F.4th at 1295–96 (citation modified).

7

Rule 803(6), the business records exception, permits the admission of records that would otherwise be hearsay if they are records of a regularly conducted activity. Fed. R. Evid. 803(6); Hatley, 153 F.4th at 1124. To be admissible, the proponent must show that the record

> (1) was prepared in the normal course of business, (2) was prepared at or near the time of the events recorded, (3) is based on the personal knowledge of the entrant or of a person who had a business duty to transmit the information to the entrant, and (4) indicates the sources, methods and circumstances by which the record was made trustworthy.

Hatley, 153 F.4th at 1124 (citation modified); see Fed. R. Evid. 803(6)(A)–(C). Even if those requirements are met, the record will not be admitted if the opposing party "show[s] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E). The proponent may meet the requirements of Rule 803(6) through the testimony of the record's custodian or another qualified witness with personal knowledge of the record's contents. Hatley, 153 F.4th at 1124; Fed. R. Evid. 803(6)(D). The personal knowledge requirement "is not difficult to meet." Hatley, 153 F.4th at 1124 (citation modified).

Ms. Tomlinson testified she did not know who made the record and when it was entered. Accordingly, Mr. Lynn argues that the government did not prove that the record was made at or near the time of the events it recorded and that it was made by someone with knowledge of that information. Aplt. Br. at 16–17. He also reminds us that Mr. Lynn's CDIB card was apparently issued in 1991 but his tribal enrollment record was only created in 2001; accordingly, he argues that the tribal

8

record could not have been created "at or near to the time" his CDIB was issued. Id. at 17. But he misapprehends Rule 803(6)'s requirements.

The proponent of a business record need not produce the creator of the record. Fed. Deposit Ins. Corp. v. Staudinger, 797 F.2d 908, 910 (10th Cir. 1986). Nor is it necessary for the foundational witness to have firsthand knowledge of the content of the record, who prepared the record, or the preparation of the specific record itself. In re Int'l Mgmt. Assocs., LLC, 781 F.3d 1262, 1268 (11th Cir. 2015); In re Kim, 809 F. App'x 527, 540 (10th Cir. 2020). Instead, it is enough that the witness demonstrates that he or she has sufficient knowledge of the recordkeeping requirements for the produced record. Kim, 809 F. App'x at 540; accord McCormick on Evidence § 292 (9th ed. 2025). Requiring anything more would undermine the purpose of the business records rule. See United States v. Franks, 939 F.2d 600, 602 (8th Cir. 1991); United States v. Keplinger, 776 F.2d 678, 694 (7th Cir. 1985). That is because the exception relies on the "high degree of reliability" of business records since "businesses have incentives to keep accurate records." Harper, 118 F.4th at 1299 (citation modified). Such records "are accurate because the information is part of a regularly conducted activity, kept by those trained in the habits of precision, and customarily checked for correctness, and because of the accuracy demanded in the conduct of the [organization's] business." Id. (citation modified).

Ms. Tomlinson had sufficient personal knowledge supporting the district court's admission of Exhibit 59 under the business records exception. At trial, Ms. Tomlinson testified that she had worked for the Choctaw Nation's tribal enrollment

9

department since 2016 and supervised a team "that process[es] CDIBs and tribal memberships." I R. 793, 808–09. She explained the process of enrolling in the Choctaw Nation, beginning with the applicant applying for a CDIB card with the tribe; once the tribe reviews and processes that application, it is sent to the BIA for final approval. Id. at 793–94. The BIA then issues a CDIB identifying the applicant's blood quantum; if the applicant has applied for tribal membership, the tribe processes and approves that application as well. Id. at 794–95. The tribe independently verifies the applicant's blood quantum and Choctaw heritage by confirming direct descendancy from a member on the Dawes Roll through the provision of supporting documents, such as a birth certificate.[2] Id. at 794–95, 807. The tribe keeps hard copies of applications and related documents in a secure physical vault as well as in an online database. Id. at 795–96, 803, 805–07. The tribe maintains and uses the database in its regular course of business to verify tribal enrollment, with access to it limited to BIA officials and members of the tribe's enrollment department. Id. at 796–97, 806–07. She also explained that the process of reviewing applications and entering information into the database is part of her regular job responsibilities. Id. at 836–42.

Ms. Tomlinson further testified that she was unaware of any changes since 1980 to the general procedure for verifying tribal enrollment. Id. at 840–41. She also testified that she was unaware of any changes to the BIA's procedure for issuing

---

[2] Ms. Tomlinson testified that there is no minimum threshold of Choctaw blood required for enrollment in the Choctaw Nation. I R. 795.

CDIBs since 1979.  Id. at 813–14.  And she said that she took the screenshot of Mr. Lynn's entry herself and that it was created before the beginning of the litigation by the person who entered the information into the database.  Id. at 797–98.  It is true that she did not know who reviewed Mr. Lynn's information or when exactly that information was entered into the database, and that she could not speak to the specific procedures by which the information would have been transferred from hard copies to the computer between 1991 and 2001, when Mr. Lynn's tribal enrollment record would have presumably been created.  Id. at 814–16.  But those arguments go to weight rather than admissibility.[3]  See Kim, 809 F. App'x at 541–42.  The court's determination that the screenshot was admissible only meant that the jury could consider it when "find[ing] facts or draw[ing] factual inferences[.]"  Ellis v. Salt Lake City Corp., 147 F.4th 1206, 1223 n.7 (10th Cir. 2025).  The court's ruling did "not control" how the jury was to view the screenshot.  Id.  That, as the court instructed, was the sole province of the jury.[4]  See I R. 1117.

---

[3] In his reply brief, Mr. Lynn argues that Ms. Tomlinson's testimony about the Choctaw Nation's recordkeeping procedures cover only the period of her employment, from 2016 to 2024, and therefore that the government did not produce a witness who had "knowledge of the procedure under which the records were created."  Aplt. Reply Br. at 5 (emphasis omitted) (quoting Collins v. Kibort, 143 F.3d 331, 337–38 (7th Cir. 1998)).  Putting aside any waiver issues, as we have explained, Ms. Tomlinson testified that to her knowledge, the tribe's general procedure for approving enrollment has not changed since 1980.

[4] At oral argument, Mr. Lynn asserted that, rather than introducing the screenshot, the government could have produced Mr. Lynn's CDIB, ostensibly resolving any issues of reliability because CDIBs are self-authenticating.  Oral Arg. at 12:33–14:18, 14:57–15:30.  But authenticity and reliability are two distinct concepts, and satisfying the authenticity requirement does not mean that a record that

11

Mr. Lynn cites United States v. Harper, 118 F.4th 1288 (10th Cir. 2024), and United States v. Wood, 109 F.4th 1253 (10th Cir. 2024), Aplt. Br. at 17, but neither case supports his position. In Harper, we determined that a letter produced by a tribe confirming that the defendant had a CDIB and was a tribal member did not meet Rule 803(6)'s requirements because it was prepared in anticipation of litigation and lacked the guarantees of trustworthiness that come with business records. 118 F.4th at 1297–1300. And in Wood, we addressed whether the government had met Rule 902's requirements for self-authenticating documents. 109 F.4th at 1263–65. Mr. Lynn has not shown that Exhibit 59 was prepared in anticipation of litigation or otherwise lacks guarantees of trustworthiness. Fed. R. Evid. 803(6)(E). Nor has he challenged its authenticity.

Based on Ms. Tomlinson's testimony, we conclude that the government established that Exhibit 59 meets 803(6)'s requirements and that the district court did not abuse its discretion in admitting it. As stated by counsel, "[T]he question is not was there more that could have been done; it's whether the process [for admission was] satisfied." I R. 827. It was.

---

is otherwise hearsay is admissible absent an applicable exception. Hatley, 153 F.4th at 1124; United States v. Thomas, No. 99-1334, 2000 WL 912610, at *4 (10th Cir. July 7, 2000); Fed. R. Evid. 901 advisory committee's notes on proposed rules ("[C]ompliance with requirements of authentication . . . by no means assures admission of an item into evidence, as other bars, hearsay for example, may remain.").

### 2. Confrontation Clause.

Mr. Lynn also argues that Exhibit 59 violated the Confrontation Clause. Aplt. Br. at 18–19. The Sixth Amendment's Confrontation Clause "prohibits admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." United States v. Draine, 26 F.4th 1178, 1194 (10th Cir. 2022) (citation modified). We review claims of Confrontation Clause violations de novo. Id.

Mr. Lynn's principal contention is that the CDIB information in Exhibit 59 was double hearsay, as it was prepared by the BIA rather than the tribe, so he was not entitled to cross examination on that information. Aplt. Br. at 18–19. We disagree.[5]

"Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person." United States v. Blechman, 657 F.3d 1052, 1065 (10th Cir. 2011) (citation modified). Any such information must ordinarily fall into its own hearsay exception to be admissible. United States v. Ary, 518 F.3d 775, 787 (10th Cir. 2008). But we recognize an

_____

[5] As an initial matter, we question whether Mr. Lynn properly preserved his Confrontation Clause claim. At trial, he objected to Exhibit 59's admission under Rule 803(6), on Sixth Amendment and Confrontation Clause grounds, and under "other" evidentiary rules "that would apply[.]" I R. 808, 832–33, 847–48. But the record does not suggest he "specifically and clearly apprise[d] the district court" of his double hearsay objection. United States v. Paycer, 154 F.4th 1261, 1269, 1271 (10th Cir. 2025) (finding the defendant's "simple" hearsay objection did not preserve his double hearsay claim). But we need not decide the preservation issue because we find no error.

exception to this rule: "information provided by an outsider that is included in a business record may come in under the business records exception if the business entity has adequate verification or other assurance of accuracy of the information provided by the outside person." Blechman, 657 F.3d at 1066 (citation modified). To "demonstrate this guarantee of trustworthiness," the proponent may provide "(1) proof that the business has a policy of verifying the accuracy of information provided by someone outside the business; or (2) proof that the business possesses a sufficient self-interest in the accuracy of the record to justify an inference of trustworthiness." Id. (citation modified).

We see no reason to doubt that the tribe verified Mr. Lynn's CDIB information given that the tribe first reviews and processes CDIB applications before sending them to the BIA, that the CDIB information comes directly from the BIA, and that the tribe verifies blood quantum. And because a CDIB is required for enrollment in the Choctaw Nation, I R. 794, we find that the tribe has more than enough interest in ensuring the accuracy of that information, see Blechman, 657 F.3d at 1066.

Mr. Lynn relies on United States v. Gwathney, 465 F.3d 1133 (10th Cir. 2006), for support. Aplt. Br. at 18. There, we held the district court erred in admitting a response by Western Union to a government subpoena as a business record of the government because the government did not prepare the document. Gwathney, 465 F.3d at 1141–42. But we reached that conclusion because we found that Western Union's legal obligation to comply with the terms of the subpoena could not overcome the fact that the government had not shown that the response was a

14

business record of Western Union or otherwise fell into another applicable hearsay exception. Id. But here, unlike in Gwathney, the government did not seek to admit an entirely separate record from another organization (i.e., the CDIB itself), but rather the tribe's record that includes information from the CDIB. That a record includes or relies in part on information from an outside source does not render that information inadmissible hearsay if that source was "also under a business duty indicating reliability." Ary, 518 F.3d at 787. As Ms. Tomlinson stated, the BIA relies on information provided by the tribe before issuing a CDIB, as the tribe reviews and processes CDIB applications before sending them to the BIA for final approval. Moreover, the BIA is undoubtedly "under a business duty to provide accurate information" to the tribe given that it relies on CDIB information from the BIA for enrollment. Ary, 518 F.3d at 787. We see no evidence that the "link in the trustworthiness chain was broken." Id. Accordingly, we reject Mr. Lynn's argument that the information pertaining to his CDIB in Exhibit 59 was double hearsay.

While records may be admissible under the business records exception, they may still violate the Confrontation Clause if they are testimonial — that is, if the record in question is one "that a reasonable person in the position of the declarant would objectively foresee might be used in the investigation or prosecution of a crime." United States v. Yeley-Davis, 632 F.3d 673, 679 (10th Cir. 2011) (citation modified). A key consideration is whether the business record "was created for the administration of an entity's affairs or for the purpose of establishing or proving some fact at trial." Id. Mr. Lynn does not argue that the CDIB information, let alone

15

Exhibit 59, was testimonial in nature.  Ms. Tomlinson testified that the record itself

was not prepared in anticipation of litigation, and we see no evidence to the contrary.

Therefore, we conclude that it was not testimonial and that its admission did not

violate the Confrontation Clause.[6]

**B.  Instructional Errors.**

Mr. Lynn also asserts two instructional errors pertaining to the self-defense

and imperfect self-defense instructions given at trial.  We review jury instructions de

novo, considering them in the context of the entire trial to determine whether they

correctly stated the governing law and gave the jury an accurate understanding of the

relevant legal standards and factual issues.  United States v. Woodmore, 127 F.4th

193, 209 (10th Cir. 2025).  Thus, we must determine whether the district court

abused its discretion in crafting a particular instruction and giving or refusing to give

an instruction.  Id.  An abuse of discretion occurs when the district court's decision is

"arbitrary, capricious or whimsical or falls outside the bounds of permissible choice

in the circumstances."  Id. (citation modified).

We afford trial judges "substantial latitude and discretion in tailoring and

formulating the instructions" and they need not be flawless "so long as they are

---

[6] We also question the relevance of the issuance and date of issuance of Mr. Lynn's CDIB to his Indian status.  It is the government's burden to prove that Mr. Lynn was a member of a federally recognized tribe and had some Indian blood, not that he had a CDIB.  See Harper, 118 F.4th at 1296.  Exhibit 59 provides evidence of both of those facts.  Moreover, as Ms. Tomlinson explained, the tribe independently verifies an applicant's Choctaw ancestry by tracing his or her lineage to someone on the Dawes Roll.  But we need not address any issues of harmlessness because we conclude there was no error.

16

correct statements of law and fairly and adequately cover the issues presented." United States v. Wofford, 169 F.4th 1020, 1024 (10th Cir. 2026) (citation modified). Ultimately, then, the standard of review for instructional challenges is whether the jury, when considering the instructions as a whole, was misled. Id. Therefore, we will not reverse unless "we have substantial doubt that the jury was fairly guided." Id. (citation modified).

"A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." United States v. Britt, 79 F.4th 1280, 1286 (10th Cir. 2023) (citation modified). We impose this undemanding burden so as "to ensure the jury is appropriately equipped to resolve the underlying factual questions raised by the evidence at trial." United States v. Brown, 128 F.4th 1358, 1366 (10th Cir. 2025). Once a defendant properly raises a defense, including self-defense and imperfect self-defense, the government must prove beyond a reasonable doubt the absence of that defense. United States v. Maryboy, 138 F.4th 1274, 1290 (10th Cir. 2025); accord Tenth Cir. Crim. Pattern Jury Instr. §§ 1.28 cmt., 1.28.2 cmt. (2026). "Otherwise, the [g]overnment is exempted from its obligation under the Due Process Clause to prove the defendant guilty . . . beyond a reasonable doubt." Maryboy, 138 F.4th at 1290 (citation modified).

We subject preserved instructional errors to harmless error review, meaning the government must show that the error did not affect the defendant's substantial rights to justify affirmance. United States v. Kirby, 161 F.4th 1208, 1213–14 (10th

17

Cir. 2025); United States v. McGirt, 71 F.4th 755, 760 (10th Cir. 2023); Fed. R. Crim. P. 52(a). In other words, the government must show that the error did not substantially influence the outcome of the trial or leave us with grave doubts about its outcome. Kirby, 161 F.4th at 1214. For constitutional errors, the government must prove harmlessness beyond a reasonable doubt. Id. at 1213. For nonconstitutional errors, it must prove harmlessness by a preponderance of the evidence. Id.

### 1. Self-Defense Instruction.

Mr. Lynn's second claim of error involves the court's instructions on self-defense. Self-defense, or perfect self-defense, applies if the defendant "reasonably believes that he is in imminent danger of death or great bodily harm, thus necessitating an in-kind response." United States v. Toledo, 739 F.3d 562, 567 (10th Cir. 2014).

Before trial, Mr. Lynn proposed giving the jury a self-defense instruction. I R. 264. Relevant here, that proposed instruction stated: "Self-defense only requires the defendant's reasonable belief that deadly force was necessary, not that he exercise a duty to retreat or recognize the unavailability of reasonable alternatives." Id. This language was taken verbatim from our decisions in United States v. Hicks, 116 F.4th 1109, 1118 (10th Cir. 2024), and United States v. Toledo, 739 F.3d 562, 568 (10th Cir. 2014). The court added the quoted language, with stylistic modifications, to what would become the final instruction. I R. 1139 (Instruction No. 21). Over defense counsel's objections, it added a third sentence, using language from Hicks:

Self-defense only requires the defendant's reasonable belief that deadly force was necessary. A defendant has no duty to retreat or recognize the unavailability of reasonable alternatives. <u>However, you may consider the defendant's ability or opportunity to retreat as a factor in assessing whether his use of deadly force was reasonably necessary to defend himself under the circumstances.</u>

Id. at 1061–68, 1139 (emphasis added); see Hicks, 116 F.4th at 1118.

On appeal, Mr. Lynn argues that the district court abused its discretion by adding the third sentence to the instruction.[7] Aplt. Br. at 11. But he does not claim that the instruction misstated the law on self-defense. Id. Indeed, he could not, as it parrots almost exactly what we have explained self-defense requires. Hicks, 116 F.4th at 1118. Instead, Mr. Lynn asserts that "[t]he issue of 'a duty to retreat' never arose in Mr. Lynn's trial." Aplt. Br. at 28. He therefore contends that the addition of the third sentence was error because the instructions were not sufficiently tailored to the "'peculiar facts and legal issues' presented in [his] case." Id. at 25 (quoting Hicks, 116 F.4th at 1121).

But Mr. Lynn ignores the fact that the court is under an obligation to "correctly instruct the jury on the law." Zia Shadows, L.L.C. v. City of Las Cruces, 829 F.3d 1232, 1242 (10th Cir. 2016). Had the court included only the second sentence, without the third, it would have given the jury an inaccurate understanding of the law on self-defense. Mr. Lynn cannot ask the court to give the jury an

---

[7] The government argues that Mr. Lynn waived this claim of error because he failed to preserve it, and because he invited the alleged error. Aplee. Br. at 25–29. We assume without deciding that the issue was not waived because, as we conclude here, there was no error.

incomplete picture of the law by requesting it instruct on a potentially favorable point of law but not an unfavorable one.

Mr. Lynn cites to Hicks and Toledo, but neither case can save his argument. In each case, the district court failed to instruct the jury on self-defense when the "peculiar facts and legal issues" raised in each case merited such an instruction. Hicks, 116 F.4th at 1121 (citation modified); accord Toledo, 739 F.3d at 567–68. Mr. Lynn's claim of error is different — here, the district court elected to give a self-defense instruction, so our determination is whether the court properly gave that instruction. We find it did.

We see no indication that the jury was misled by the instruction. And given the trial court's obligation to instruct the jury on the correct law and our deferential standard of review, we find that the court did not abuse its discretion in adding the third sentence.

### 2. Imperfect Self-Defense Instruction.

Mr. Lynn's third and final claim of error pertains to the court's imperfect self-defense instructions. We begin with a discussion of the relevant law before recounting the instructions themselves and then analyzing whether reversible error occurred.

#### a. Relevant Law.

Imperfect self-defense is closely related to but distinct from perfect self-defense. "In both the perfect and imperfect self-defense contexts, the defendant must possess the subjective belief that deadly force was necessary to prevent death or great

20

bodily harm." Britt, 79 F.4th at 1286 (citation modified).  In other words, the defendant must have an actual belief that (1) he faced imminent danger of death or great bodily harm and (2) the force he used was necessary to prevent death or such harm.  See United States v. Walker, 130 F.4th 802, 807 (10th Cir. 2025), cert. denied, 146 S. Ct. 277 (2025) (mem.); accord Tenth Cir. Crim. Pattern Jury Instr. § 1.28.2.  But unlike imperfect self-defense, perfect self-defense requires that the defendant's beliefs also be objectively reasonable.  Britt, 79 F.4th at 1287.

Perfect self-defense is a complete defense to first-degree and second-degree murder; if the jury finds it applies, the defendant is entitled to a complete acquittal.  Id. at 1286; Maryboy, 138 F.4th at 1278.  Imperfect self-defense, however, is only a "mitigating defense[.]" Walker, 130 F.4th at 807.  Therefore, "if a jury finds it applies, the defendant is guilty of involuntary manslaughter, rather than murder." United States v. Rainford, 161 F.4th 648, 669 (10th Cir. 2025) (citation modified).  That is so because imperfect self-defense negates first- and second-degree murder's malice element.  See Brown, 128 F.4th at 1366; Britt, 79 F.4th at 1287 n.2; Tenth Cir. Crim. Pattern Jury Instr. § 1.28.2.

### b.  The Jury Instructions.

While Mr. Lynn proposed a perfect self-defense instruction, I R. 264, the record does not indicate that he proposed or tendered an imperfect self-defense instruction, id. at 237–82; see Aplee. Br. at 9.  Despite the apparent lack of a request for such an instruction, the court included one.  I R. 916.

21

Because the court elected to give an imperfect self-defense instruction, Mr. Lynn requested that the jury be instructed (as an element of the homicide offenses) that the government must prove beyond a reasonable doubt that the killing was not done in imperfect self-defense. Id. The court rejected his request to avoid confusing the jury, stating that separate instructions on involuntary manslaughter and imperfect self-defense were sufficient and would be "simpler." Id. at 917. Defense counsel later renewed that request, which the court again rejected. Id. at 1068.

Before closing arguments, the court instructed the jury on perfect self-defense (Instruction No. 21), intoxication (Instruction No. 22), Count One of the indictment (Instruction No. 23), first-degree murder (Instruction No. 24), the lesser-included offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter (Instruction Nos. 25–27), and then on imperfect self-defense (Instruction No. 28). Id. at 1072–73, 1139–50. The first-degree murder, second-degree murder, and voluntary manslaughter instructions each included perfect self-defense as an essential element that the government had to disprove beyond a reasonable doubt. Id. at 1142–47. None of those instructions made any mention of imperfect self-defense.

As for involuntary manslaughter, the court told the jury it must determine whether Mr. Lynn was guilty of the charge if it found him not guilty of or could not agree on a verdict as to the greater-included homicide offenses. Id. at 1148. The involuntary manslaughter instruction also stated:

22

> Involuntary Manslaughter in Indian Country makes it a crime to unlawfully kill a human being without malice while committing a lawful act in an unlawful manner, or without due caution and circumspection, which act might produce death. . . .
>
> A person may commit a lawful act in an unlawful manner, or without due caution and circumspection, if he acts in "imperfect" self defense.

Id. at 1148–49.  The imperfect self-defense instruction stated:

> A person acts in "imperfect" self-defense if he subjectively believed, at the time he acted, that his actions were necessary for the defense of himself against the immediate use of unlawful force to prevent death or great bodily harm, but his belief was objectively unreasonable.
>
> The difference between self-defense and imperfect self-defense is whether the defendant's belief was reasonable.  A person whose belief in the need for self-defense was reasonable has acted in self-defense.  A person whose belief was unreasonable has acted in imperfect self-defense.
>
> A defendant who acts in imperfect self-defense commits involuntary manslaughter.

Id. at 1150.  None of these instructions explicitly told the jury that the government bore the burden of proving that the homicide was not done in imperfect self-defense beyond a reasonable doubt.  Additionally, the verdict form made no mention of imperfect self-defense; instead, it instructed the jury to address the next lesser-included homicide offense if it found Mr. Lynn not guilty of, or could not agree on, the greater-included offense(s).  Id. at 1163–64.

### c.  Reversible Error.

On appeal, Mr. Lynn argues that the court erred when it overruled defense counsel's request to include imperfect self-defense as an essential element of the charged homicide offenses that the government must disprove beyond a reasonable

23

doubt, requiring reversal of his conviction for first-degree murder. Aplt. Br. at 31–32.

Our recent decision in United States v. Maryboy, 138 F.4th 1274 (10th Cir. 2025), is instructive. There, the defendant was charged with second-degree murder; the court determined that perfect and imperfect self-defense instructions were warranted. See Maryboy, 138 F.4th at 1280. To streamline the instructions, the court revised the parties' proposed instructions, but in doing so, it included only a portion of the imperfect self-defense instruction as part of the involuntary manslaughter instruction. Id. at 1290. Crucially, it failed to instruct the jury "that the government had to prove beyond a reasonable doubt that [the defendant] had not acted in imperfect self-defense." Id. Reviewing for plain error, we determined that the court committed clear and obvious error by and through this omission because "the government was not held to its burden under the Due Process Clause" to prove the absence of imperfect self-defense beyond a reasonable doubt. Id. at 1292–93.

We see little distinction between this case and Maryboy; if anything, the error here is manifest and counsel took care to preserve the issue, thus it is unnecessary to address plain error. Although the court in this case gave a separate imperfect self-defense instruction, neither the involuntary manslaughter instruction nor the imperfect self-defense instruction told the jury that the government must disprove imperfect self-defense beyond a reasonable doubt. Moreover, the murder instructions were devoid of any mention of imperfect self-defense, so the instructions did not clearly advise the jury that it was a defense to murder. Maryboy, 138 F.4th at 1293.

24

It was only after the jury heard the self-defense, first-degree murder, second-degree murder, and voluntary manslaughter instructions that it heard any mention of imperfect self-defense.  And it was only told to consider involuntary manslaughter if it found Mr. Lynn not guilty of the greater-included homicide charges.  Therefore, here, as in Maryboy, "[t]he very structure of the [instructions] precluded the jury from considering the effect of [imperfect self-defense] on the murder count" and improperly relieved the government of its burden to disprove imperfect self-defense beyond a reasonable doubt.[8] Id. (citation modified).

We are unpersuaded by the government's arguments that there was no error.  It first asserts the jury was not misled when considering the instructions as a whole.  Aplee. Br. at 38–39.  It points to the facts that the court properly distinguished between perfect and imperfect self-defense; that it told the jury that if it found Mr. Lynn acted in perfect self-defense it must find him not guilty, while if it found he acted in imperfect self-defense, he was guilty of involuntary manslaughter; and that each of the three greater-included homicide charge instructions told the jury that it must "exclude [perfect] self-defense beyond a reasonable doubt before [it] could convict."  Id.  But none of these instructions can remedy what is missing: informing the jury that the government had to disprove imperfect self-defense beyond a

_____

[8] We recognize that we decided Maryboy after Mr. Lynn's trial, but Maryboy relied upon United States v. Lofton, 776 F.2d 918, 920 (10th Cir. 1985).  In any event, we apply the law at the time we decide the appeal.  See Pelt v. Utah, 539 F.3d 1271, 1282 (10th Cir. 2008); see also United States v. Venjohn, 104 F.4th 179, 186 (10th Cir. 2024) (obviousness of plain error determined at the time of the appeal).

25

reasonable doubt. Nor do we believe that a lay jury could have deduced that imperfect self-defense was a defense to murder based on the lesser-included offense instructions. That is particularly so given the order in which the court instructed the jury — on perfect self-defense, then on the elements of the four possible homicide offenses, then on involuntary manslaughter, and then on imperfect self-defense. Contrary to the government's assertion, we have serious doubts that the jury was adequately instructed on the relevant law when considering the instructions as a whole.[9] Wofford, 169 F.4th at 1024.

The government also tries to distinguish the instant appeal from Maryboy because here "the district court did give a standalone imperfect self-defense instruction." Aplee. Br. at 40. But our holding in Maryboy was not that imperfect self-defense must be given as a separate instruction from involuntary manslaughter, but that the court is obligated to instruct the jury that the government must disprove imperfect self-defense beyond a reasonable doubt. So this is a distinction without a difference.

---

[9] Although Mr. Lynn does not argue so on appeal, and although our pattern instructions in effect at the time of trial did not have separate instructions on imperfect self-defense, we think that the language of the given instruction itself is wanting for other reasons. For example, the instruction does not define what it means for the defendant to have a "subjective" belief that force was necessary. Compare I R. 1150, with Tenth Cir. Crim. Pattern Jury Instr. § 1.28.2 (defining "actual belief"). Further, while it clarifies that the difference between perfect and imperfect self-defense "is whether the defendant's belief was reasonable[,]" it is not clear from the context what exactly this "belief" is. I R. 1150. The lack of clarity in the instruction is compounded by the fact that the jury did not hear the imperfect self-defense instruction immediately after the perfect self-defense instruction, making it difficult to discern the pertinent distinctions between them.

But finding error is not enough to warrant reversal — we must still affirm if the government proves the error was harmless beyond a reasonable doubt. Britt, 79 F.4th at 1292. To support its claim of harmlessness, the government argues that the jury would have found Mr. Lynn guilty based on the overwhelming evidence of Mr. Lynn's premeditation and the purported lack of any evidence pointing to imperfect self-defense, as well as the jury's guilty verdict on first-degree murder, which it claims was a rejection of any claim of self-defense. See Aplee. Br. at 41–44. It primarily relies on United States v. Sago, 74 F.4th 1152 (10th Cir. 2023), for support. Granted, the likelihood of a different outcome may be diminished when a jury finds premeditation beyond a reasonable doubt. See Sago, 74 F.4th at 1162–63; Maryboy, 138 F.4th at 1294–95; Rainford, 161 F.4th at 667–69. But a finding of premeditation cannot satisfy the government's burden to establish harmlessness in this case.

Nor do we find persuasive the government's argument that the error was harmless because the case against Mr. Lynn was strong. As we stated in United States v. Britt, 79 F.4th 1280 (10th Cir. 2023), concluding the error was harmless would require concluding "as a matter of law[] that no reasonable juror could find that [Mr. Lynn] did not subjectively believe that he was in imminent danger of death or great bodily harm[.]" 79 F.4th at 1293. To do so, however, "would be directly contrary to the district court's ruling at trial." Id. After all, the district court determined that an imperfect self-defense instruction was warranted. Therefore, it "necessarily concluded as a matter of law that reasonable jurors could find that [Mr. Lynn] had [a] subjective belief" that he faced imminent danger of death or great

bodily harm and that the force he used was necessary to prevent death or great bodily harm.  Id.; Tenth Cir. Crim. Pattern Jury Instr. § 1.28.2.

As Britt makes clear, the strength of the evidence against Mr. Lynn does not carry the day as to harmlessness because the district court already determined that Mr. Lynn had met the low evidentiary showing needed to give an imperfect self-defense instruction.  See Britt, 79 F.4th at 1293.  Finding harmlessness on that basis would thus be contrary to the district court's legal conclusion that there was sufficient evidence to warrant giving such an instruction.  And given that the government does not claim that it was error for the district court to give the instruction, affirming based on harmlessness would put us in the fraught position of deciding an issue that is not before us on appeal.  See Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 549 (2001); United States v. Chee, 514 F.3d 1106, 1112 n.1 (10th Cir. 2008).

Moreover, the record indicates that Mr. Lynn met the low burden of production required.  Defense counsel elicited testimony from Mr. Lynn's brother and Mr. Ervin that Mr. Lynn claimed, after the shooting, that a "white guy" or "white dude" shot at him first.  I R. 593, 612.  While the police only identified five shell casings, Jason testified that he heard up to twelve shots, and there were more than five bullet holes in the tents.  Id. at 588, 946–47.  Witnesses also testified that it was not unusual to hear shots in the area.  Id. at 505–06, 611.  When determining sufficiency of the evidence in support of an instruction on a defense, we must accept the testimony most favorable to the defendant, Britt, 79 F.4th at 1291, and "weak and

28

contradicted" evidence "can still be a basis for [such] an instruction[,]" <u>Rainford</u>, 161 F.4th at 670 (citation modified).  Therefore, the district court erred and the government has not proven harmlessness beyond a reasonable doubt.

For the foregoing reasons, we **AFFIRM** the district court's decision to admit Exhibit 59 and its overruling Mr. Lynn's objection to the perfect self-defense instruction, and accordingly **AFFIRM** his convictions on Counts Two, Three, and Four.  However, because we find non-harmless error with the imperfect self-defense instruction, we **REMAND** to the district court with instructions to **VACATE** Mr. Lynn's conviction on Count One only and conduct further proceedings consistent with this opinion.